The next matter on our calendar is Kim Hanna and others versus Walmart Stores Incorporated and others. Thank you. Good morning. Good morning. May it please the Court? Chris and Peter Samlin for the plaintiffs. In this case involving a reorganization that was allegedly occasioned by job eliminations, Plaintiff Michael Barham applied for 17 jobs, three of which he applied for during his interim status period between January and April 2010 before he was officially terminated, and 14 of which he applied after his April termination. Hanna applied, Plaintiff Hanna applied a total of 27 times, including for two MHRM market human resource management jobs before she was terminated and 25 after she was terminated in April. That was the job title she held, wasn't it? Yes, Your Honor. Irving applied for four jobs after he was one to go to a jury verdict. Initially, he dismissed none of the applications for rehire in his summary judgment decision. Then in a motion to reconsider, Walmart made new arguments in its reply to which the plaintiff received no opportunity to respond. The Court then dismissed, changed his summary judgment decision, dismissed. The arguments were that there was not proximity because of the amount of time, and you are now making the argument that there was proximity because the suits were continuing in place. Is that right? That is one of my arguments, Your Honor. Yes. They were ongoing complaints. But moreover, Your Honor, the – there were complaints that were made prior to the actual April – Yes, but let's just focus on that. Isn't that pretty clearly enough? I mean, isn't that a fundamental error of the – that the district court made, that if the suits were going on, that actions taken while they were going on were proximate? Now, whether there were other reasons why there wasn't causation, that might still be up, but isn't that a reason enough to say error? Yes, Your Honor. And that would be – and that's with respect to all of the ones that arose after the CHRO complaint. But keep in mind that during the interim period, before the CHRO complaint, there were – there's undisputed evidence of complaints that were made by Hannah and Barham and Irving to their supervisors. For instance, there's no dispute whatsoever that Hannah complained all the way up to the highest levels of the HR management about her direct supervisor and two decision makers. And then she was terminated. That was in December of 2009. And she was terminated in January of 2010. That's one month later. Moreover, it's undisputed that Mr. Barham made a complaint to the highest levels of the asset – the asset protection organization, to Monica Mullins, between February and March of 2010, that he was not being reconsidered for whatever reason for jobs that were reopening. Now, the Gallo case makes abundantly clear that if there's a reorganization, an alleged reorganization because of a job elimination, and then all of a sudden, like Bobo Dolls, those same jobs or other jobs in the organization pop up immediately thereafter, that that is evidence of intent to discriminate. And in this case, Mr. Barham's own job opened up immediately before he was terminated in April 2010. And he complained about it to Monica Mullins, and then Mr. Brodus, his direct supervisor who was complained about, said in his deposition he said, I would not – I knew about his complaint about me, and I would never hire somebody who had complained about me. It's against my own interest. So there was a direct admission by his supervisor that for the three April 2010 job applications that Barham made, that he knew about it, and he would not consider him. And he also said that he thought retaliation was something that happened at Walmart, and he acknowledged his own retaliatory animus. What's amazing about those particular three applications in 2010, Your Honor, is that they would provide – they kind of serve a dual purpose, because on the one hand, those were retaliatory failures to rehire, but because they happened before he was terminated – The verdict in the one case that didn't go to trial? Yes. So that was – that was the Hannah – We have little time left, so I'm – Okay. With respect to the Hannah case, Your Honor, both her retaliatory discharge, which was – the Court said there was no evidence of pretext. That's – that was an ultimate jury decision. So he – he dismissed her retaliatory discharge claim. And then at trial, even though he allowed her to move forward with some of her retaliatory failure to rehire claims, he then held that because there was no direct evidence admitted to by the recruiters that they had – that they knew about the complaints that Hannah had made. And – and that's a violation of Gordon, because this Second Circuit decision in Gordon says – Is that incorrect? What – what evidence was there of awareness by an actual decision maker as opposed to general corporate knowledge of Hannah's protected activity? Abundant evidence. Well, give an example. Okay. So the ultimate decision maker was – was the division manager. And he said he – Wait a minute. What's his name? The name of? Pardon? What was the name of the – And I'm just having a brain freeze. But it's – it's the ultimate decision maker. And I'm blanking out on his name. Are you – And he said he knew. Are you also arguing – are you also arguing that the statement that there was general discussion between the recruiters and the decision makers in most cases is enough from which a jury could find that there was a discussion in this case? Because that's the primary evidence that you had on that. And the question is, is that enough? Now, it may well be, but together with facts that she was not interviewed in only one in – one in 17 and all the other things. But – Your Honor, you're correct. And – and this Court has – Thank you. You're – you're – the Court has acknowledged the cat's paw theory. It said even – it's – the Court has said repeatedly that even if the actual person – if there was an intervening person, if they're being told they don't know why they're being told not to hire her and they don't hire her, then that's enough. Also, this Court has said very clearly over and over again general corporate knowledge is enough. And Walmart does not deny that there was general corporate knowledge. The vice president of the company, Roz Brewer, was told directly by Hannah about it. Her division manager, who was the one who was making the decisions whether to rehire, he admitted he was the ultimate decision-maker. He said that he knew about it. Ms. Burgos admitted that she knew about it, and she was a decision-maker for a number of the – the hirings. And there was another person named Jones, who was also a decision-maker for one of the hirings, and she said she knew about it. So the Court made this fact-finding that the recruiters were some sort of a Chinese wall, ignoring the cat's paw theory that this Second Circuit has – has recognized in the past, and also – and also ignoring Gordon, which says that general corporate knowledge is enough. Plus, Your Honor, there were so many odd inconsistencies. Robin Burgos, who testified at her deposition, and she was a hiring manager, she said that she – it's strange. There's no way that she can explain that somebody who is so qualified and applied 27 times never got interviewed in 26 of those 27 times. And in Sulahera, this Court has said those – that kind of strange stuff, unexplained decisions is enough. What you're saying is the fact that she was only interviewed one out of seven, that the standard is that people were interviewed. Yes. And that somebody who had this qualification, there was evidence it was particularly so, together with a generic about corporate – about knowledge should be enough. That's the basis of your argument. Yes. In fact, on pages 27 and 30 of my – of my brief, I went through all of the various inferences that the Court could take into account, because this – this temporal proximity was one of numerous pieces of circumstantial evidence. And converting the – I think what the trial court did is he converted the temporal inference into a statute of limitations by mistake. And if that positive inference falls away, you still have the other 20 pieces of circumstantial evidence that I presented and which are enumerated on pages 27 through 30 on my brief and in my reply brief as well. I think I've run out of time. Thank you. You have reserved three minutes for rebuttal. We'll hear from Walmart. May it please the Court. My name is Craig Dickinson. I appear on behalf of the appellee cross-appellant Walmart. Your Honors, this case dates back to events that occurred only 10 years ago. The record is full of 700 – over 700 docket entries. There have been a dozen and a half depositions that required travel to Pennsylvania, Alabama, and two trips to Arkansas. The plaintiffs were given more than ample opportunity to develop a record upon which to prove their claims. They failed to do that with the exception of one claim. The overwhelming majority of their claims – the claims need to really be broken down into separate silos. Mr. Barham was in the asset protection division of the company, interacted with, but a separate organizational structure above him. And Mr. Irving and Ms. Hanna worked in the human resources support function for the operations unit. They had separate decision makers that oversaw their work and that were involved in the process. They had separate people that were involved in the hiring processes at issue in this case. Over – we have – there is no evidence whatsoever that Project Apple did not take place and did not take place in the way that Walmart said it took place. Counsel tries to make an issue about a temporal proximity between Ms. Hanna's termination and – We're more concerned with – Please. You have a lot to work from. We're more concerned with the rehiring issues and the summary judgment based against all three of them on the basis of no temporal proximity. Your Honor – And when the suits were going on, and with whether there was enough evidence on the one directed verdict that the rest of the stuff – I don't think there's much argument about, so let's focus on that. Very well, Your Honor. You raised that question in a question to counsel, that there's an issue about the temporal proximity following the filing of the CHRO claims. And we go to extensive lengths to calculate how far after those claims were filed. There's considerable case law on the circuit that says that the inference diminishes after 6 months. Yes. But the question is, does that apply when there is an ongoing suit? Your Honor, what you're suggesting, if I may, is that once they file a suit, anything that happens after that, even if it's two or four years later, dates back to that infected activity? No. The question is, and it's a question of law and is a new one, whether that is enough to raise some issue. I am suing you, and the suit is ongoing, and we're going to court, and at that point you fire me, or in this case you fail to rehire me, whether there is evidence which says that you don't hire or rehire people who have been suing me, whether that is enough to get that first thing. Whether that's then enough might be a question that we'd have to develop more, but the notion that that should not be taken into account because it was an ongoing suit, which is what the district court held, is what I have a little, you know, I'd like to hear some argument on. Because if the idea is, is it plausible that I don't like you because you sued me, the fact that the suit is ongoing, you know, a lot depends on what's happening in that suit. If the day before I had your testimony, that's very different than if a suit was started four years ago. It's ongoing, but nothing is going on. Taking what you've said, Your Honor, one, first and foremost, the law is that you draw an inference from temporal proximity, and the inference weakens over time. I don't think that that needs to change. I don't think that that does need to change. And I think that Judge Olden factored that in accordingly, that when the suit was filed four years ago and an application was made in Tennessee and nobody that was And I don't think that that changes. My question goes to what is time. Is the time the filing of the suit or the time what's happening in the suit? Well, and I'll get to that. That's the next thing I want to ask you, Your Honor, is there's no evidence that anything that was happening in the suit impacted any of those decisions. That was counsel's obligation. Let's remember how this thing comes up. You lose on this business. Then you come in and say there is an attenuation because of time. At that point, the district court rules for you. And at that point, they come in and say, hey, but this suit was ongoing. And at that point, the district court says, sorry, I'm not interested. So I'm not sure when they would have been in a position to come in and say, but the ongoing suit was something that should call to your attention. Realistically, that's why I'm saying that perhaps the appropriate thing is on that ground to say you were wrong to take it not to take that into account. Let's go back and see whether they can show something that was happening in the suit because of which there was proximity. Your Honor, they had an opportunity to do that. And I don't disagree with your analysis in total. But where I take issue with you is you did posit the possibility that something had happened in the litigation that would essentially refresh the suit. So we do argue that the suit- Yeah, but realistically, again, a district judge says it doesn't matter because the suit was brought four years ago or whatever. You as a counsel who is already having trouble with this court, okay? You're supposed to come in and say, but you told me it doesn't matter, but it does matter because I have this and this going on. Come on. But, Your Honor, I still think it goes to the causation argument that we're dealing with. Yes, yes, it goes directly- And you need to make more of a connection other than just the fact that you have a pending suit. So if you want to show me that the decision maker had been deposed, and two weeks later, or a month later, or six months, which is usually the bogey that the court considers as kind of that break-off- You need to talk into the microphone. I'm sorry, Your Honor. Within six months of that deposition, or a party testifying and raising these issues together- No, we're talking about the same thing. Counsel read to us sections of the depositions which indicate that the decision makers knew about, I think it was Kim Hanna that you were referring to, that they knew about these, excuse me, complaints. There's two issues with respect to that, Your Honor. Well, it's accurate. It's an accurate report, is it? I would take issue that they knew that the suit was ongoing. They were in depositions. They knew that the suit was ongoing. I don't know that it's as clear as counsel suggests that they knew at the time that the hiring decision was made. But I think more importantly, and where the issue comes up with respect to the directed verdict issue is, whether Ms. Burgos as a divisional HR person, or Mr. Morris as a divisional HR person, or Ms. Jones as a divisional HR person, was aware that the suit was pending, or may even have been deposed. If they did not have any contact with the recruiters that are the people that do the first pass on these jobs. When you apply to a job, you apply electronically into a system, and we've submitted it as part of the record, the lists of people that are candidates for that job. And the recruiters, the person that goes through that list, and they make the initial decision. If they don't know about the suit, there can be no either inference or direct evidence of causation, notwithstanding the fact that maybe the company at large knows about the suit. There can't be any inference that they made a decision to exclude them. Breyer. The argument they are made is, and I don't know if it's valid, if it's sufficient, is a combination of a couple of things. One, that these recruiters seem to be unusually reluctant to interview these people in relation to the number of people who are normally interviewed. And second, that there was a generic conversation between recruiters and decision. Now, whether that's enough or not, I don't know. But that's the argument. I mean, you're just saying these people are here, these people are there, they have no knowledge. This is the argument the other way. Your Honor, and I recognize that, and this is part of what we raised and why we felt that the directed verdict decision was indeed the correct conclusion. Part of what the judge is supposed to be doing here is preventing a jury from making a decision based on speculation, based on conjecture, preventing them from stacking inferences. And that is precisely what counsel is arguing here. She gives two pages of inferences that should be drawn. Now, while a reasonable inference can be drawn, and maybe many reasonable inferences can be drawn, they can't be stacked on one another. And you can't say, well, generally, the decision-makers talk to the recruiters, because of course they do. The recruiters say, here's the panel of applicants that I think that you should consider. These are the ones that I think that should pass on to you, and they'll have some discussion about it. Yeah, they talk about it. You can infer that there's some discussion. You can't then say, based on Mr. Broadus' testimony, specifically about Mr. Barham, that he would never hire a person that sued the company. You can't take an inference from his testimony about his specific practice and impute that to the decision-makers for Ms. Hanna and stack it on top of the fact that there's been some discussion occasionally, generally, between recruiters and decision-makers. There's not enough to direct, to draw the line. That you say is speculation. And I would say that that is textbook inference stacking. Okay. But what inference are we allowed to draw from the fact that Mr. Barham applied for positions that were similar to the ones from which he was removed 27 times and doesn't get an interview? Well, Your Honor — From the very position that he held? I think that — well, there's two aspects to that. First and foremost, there was error-butted testimony that in the wake of Project Apple, if you were banded red, you were not eligible to be considered for the same job that you had just been knocked out of. And while they dispute that and while they don't believe that, that's what the undisputed evidence was. What made someone banded red? Excuse me? What made someone banded red? That's the entire Project Apple process that Judge Calabresi said we're not talking about that. The evidence is very clear. They did a — basically a nationwide rack-and-stack of the entire field organization — Did they do it based on previous complaints? Is that what — That was not factored in at all. It was factored in on — they focused only on their prior performance evaluations that were mapped according to essentially an algorithm that credited what their performance had been. Is there any evidence that the recruiters, when they failed to interview this person 27 times, did, oh, she had that job, therefore she is not eligible? In the — Is there any evidence that that is what was going on? Well, Your Honor — I mean, you would think that if there were a rule at Walmart, we will not interview people for the same job that they held before, because that is so, that that would appear as a quick explanation. I mean, you know, there are any number of things. I interviewed somebody for a clerkship last year, and I don't interview the same person next year. Note, someone has reapplied, sorry, that isn't there. But — But it is specifically — specifically within the contours of Project Apple, and it addresses specifically the jobs — I understand that what you are saying was there, and yet it is a bit peculiar, isn't it, that if that was it, that these people were automatically off, that that wouldn't just say automatically, not eligible, not eligible, or some indication of that sort. That only applied during the window between January, the end of January, and April when they were let go. And that's why the jobs that they are contesting, those jobs between the time — that's the only time that applied, is we're not going to knock you out and then bring you right back. If he applied for that job a year later — Okay. And then — and some of these 27 were later, weren't they? Some, and that's why — and he won on one of them. He prevailed on that one. So that's — we don't dispute that there was evidence that drew the connection and Mr. Barham properly proved his case. We have not appealed that. Okay. Thank you. Thank you, counsel. Thank you, Your Honor. Ms. Peters, you have reserved three minutes for rebuttal. Yes. Phil — Phil Morris is the name of the decision-maker that I had forgotten. And he was actually the person, the declarant that they used in these CHRO and EEOC cases. He was directly involved in those pending cases. He was the one who swore to it. He never denied that he knew about the cases. Burgos never denied. Jones never denied. These are all the decision-makers. Right. Phil Morris admitted he was the actual decision-maker. What I'm opposing, counsel, is saying is that the recruiters were not the same group of people, nor did they know what these people knew. And that's misleading. And here's why. Because the recruiters did not deny that they had contact with Phil. But they were not — he was supposed to — he was supposed to introduce them under Rule 26. He was supposed to identify them. He never did. So I had to depose them in the week before trial. And at that time, seven or eight years had passed, and they said they didn't remember. They didn't remember whether they had talked to Phil. But they actually testified — and I've cited this in my brief — that normally they would contact the division manager or the person making the decision because they could see that on this person's resume that she used to work at Walmart. And they said that would be normal, that I would contact them, but we just don't remember. And when I asked Phil Morris on the stand in his deposition, do you deny that you told people not to hire her? He said, I can't deny that. And he — and at trial, he then tried to say that he did deny that, and then I impeached him. And by the way, that's — this whole argument regarding the recruiters being a Chinese wall, there was so much evidence before the jury that they were lying about that — I impeached Phil Morris so many times — that that is an ultimate question of fact that the jury is supposed to make regarding pretext. This court has said over and over again that pretext is a decision for the jury. No, Your Honor. The jury never found against me. There was a directed verdict. He wouldn't let it go to the jury. He took it away from the jury even before they put on their defense, right at the conclusion of my case. And Cronkleton was one of the recruiters, and I never got to depose her, and I never — and she was never on the stand. And she was a decision-maker for a number of these cases. And I asked to depose her and to call her because she wasn't produced for — under Rule 26, which is an incredible — since they're claiming that she was a decision-maker as a recruiter, they never produced her, they never identified her under Rule 26. And when I tried to depose her, the court said no. So he said there's no evidence that she knew, but she was never deposed, she never gave an affidavit, there was no evidence whatsoever. It was a clear Rule 26 violation. And this court has made clear that when a person is — a party is deprived of discovery — Did you move to compel? Oh, yes, Your Honor. Time and again. And you just were denied, so you were denied access to this individual. What I've discussed at length in both of my briefs, Your Honor, is that he put her on his witness list many years after discovery was closed. And I moved to strike her and moved to quash. And the court waited until a couple of weeks before the jury trial to deny my motion to quash. And then he said the cure is that they will be allowed, these seven — these eight witnesses that were now supposedly the decision-makers that he never identified under Rule 26, and they're like the decision-makers, and they were — he's claiming, and they were never identified, that I needed to depose them in the week before trial. So imagine, I'm preparing for trial. It's the week before trial, and I have to depose them. I was able to depose six of them. I only got two hours apiece. And then, with respect to Crunkleton, they said she wasn't available. So I was supposed to — the court was going to give me a break during the trial for a couple of hours at the end of the day to depose her. And I got the court reporter. I was ready to go. And then he just changed his mind and said that I couldn't depose her, and yet decided that that recruiter, who — we had no evidence what she was going to say, was this Chinese wall. Now, the other recruiters that testified said, we can't deny that we had contact with Phil Morris and the other people. We don't remember. We haven't — they weren't deposed in that eight-year period because he failed to identify them under Rule 26. The normal — you know, and I also would say, Your Honor, one — Your Honor's been absolutely right about everything, Judge Calabresi, but I will say one thing. With respect to this issue of the termination, the discharge, the discharge of Kim Hanna is — it's — the court is — should give — it's a retaliatory discharge. There's plenty of evidence. The Project Apple thing that they're talking about, I submitted in my summary judgment motion admissions by Mr. — by Edith Jones, a decision-maker, and also by Mr. Brodus, that there was no real reorganization under Apple when it came to MHRMs and MAPMs. It was only a real reorganization when it came to operations people. This is a whole other argument, and I'm not really sure it is appropriate on your rebuttal here now. Well, he mentioned — he mentioned it, Your Honor, and I will tell you that Hanna, if you look at what they presented as the red banding of Hanna, it didn't add up. They said she — it added up to 2.4. It added up to 2.8 under their own policies. If you're yellow-banded, which is what she actually was, if you had a 2.8, you can't be terminated. So there — her — the — there was — she complained about Phil Morris the month before she was terminated. Your Honor, I would like to — Come on now. Your time has long expired. All right. Thank you. Thank you both.